UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

STEVEN JOHN WEAREN, JR.,

                    Plaintiff,

        v.

CAROLYN W. COLVIN,
COMMISSIONER OF SOCIAL SECURITY,

                    Defendant.

_____

DECISION & ORDER

13-CV-6189P


## PRELIMINARY STATEMENT

Plaintiff Steven John Wearen, Jr. ("Wearen") brings this action pursuant to Section 205(g) of the Social Security Act (the "Act"), 42 U.S.C. § 405(g), seeking judicial review of a final decision of the Commissioner of Social Security (the "Commissioner") denying his application for Supplemental Security Income Benefits ("SSI"). Pursuant to 28 U.S.C. § 636(c), the parties have consented to the disposition of this case by a United States magistrate judge. (Docket # 13).

Currently before the Court are the parties' motions for judgment on the pleadings pursuant to Rule 12(c) of the Federal Rules of Civil Procedure. (Docket ## 10, 11). For the reasons set forth below, this Court finds that the decision of the Commissioner is supported by substantial evidence in the record and is in accordance with applicable legal standards. Accordingly, the Commissioner's motion for judgment on the pleadings is granted, and Wearen's motion for judgment on the pleadings is denied.

## BACKGROUND

### I.    Procedural Background

Wearen applied for SSI on July 14, 2010, alleging disability beginning on January 1, 2008, due to diabetes, high blood pressure, two bad knees, ankle problems and back problems. (Tr. 168-71, 187).[1]  On September 10, 2010, the Social Security Administration denied Wearen's claim for benefits, finding that he was not disabled.[2]  (Tr. 76).  Wearen requested and was granted a hearing before Administrative Law Judge John P. Costello (the "ALJ").  (Tr. 116-18, 126-30).  The ALJ conducted a hearing on November 28, 2011 in Rochester, New York. (Tr. 31-74).  Wearen was represented at the hearing by his attorney Kelly Laga, Esq.  (Tr. 31, 150).  In a decision dated December 16, 2011, the ALJ found that Wearen was not disabled and was not entitled to benefits.  (Tr. 19-26).

On February 15, 2013, the Appeals Council denied Wearen's request for review of the ALJ's decision.  (Tr. 1-5).  Wearen commenced this action on April 12, 2013 seeking review of the Commissioner's decision.  (Docket # 1).

### II.    Relevant Medical Evidence[3]

#### A.    Treatment Records

##### 1.    Culver Medical Group

Treatment records indicate that Wearen began treatment with Steven Scofield ("Scofield"), MD, and Sachin Shah ("Shah"), MD,[4] in April 2008.  (Tr. 445-48).  On April 10,

---

[1]  The administrative transcript shall be referred to as "Tr. __."

[2]  Wearen previously applied for benefits and was denied benefits in decisions dated June 15, 2009 and February 6, 1995.  (Tr. 75, 211).

[3]  Those portions of the treatment records that are relevant to this decision are recounted herein.

2008, he attended his first appointment with Shah.  (*Id.*).  According to the treatment notes, Wearen was previously treated at the Strong Memorial Health Pediatric Clinic.  (*Id.*).  The notes indicate that Wearen's main medical problems include morbid obesity, uncontrolled diabetes mellitus type 2, hypertension and left ventricular hypertrophy.  (*Id.*).  Wearen was first diagnosed with diabetes in approximately 2002, and he reported that he did not regularly check his blood glucose level.  (*Id.*).  According to Wearen, he walks approximately thirty minutes a day, approximately two to three times each week.  (*Id.*).  Treatment notes indicate that Wearen presented multiple cardiac risk factors and that his compliance with his hypertension medication regimen was inconsistent.  (*Id.*).

Treatment notes also indicate that Wearen had a history of right knee pain stemming from a basketball injury.  (*Id.*).  According to the notes, the injury included cartilaginous defects, ligamentous injury and persistent knee effusion.  (*Id.*).  Wearen's knee was evaluated by an orthopedist in 2005.  (*Id.*).  He did not follow through on a subsequent referral to the orthopedist in 2007.  (*Id.*).

Wearen also reported a history of marijuana abuse.  (*Id.*).  According to Wearen, he smoked approximately 5-10 "blunts" each day for the past approximately six years.  (*Id.*). Wearen reported that he stopped smoking marijuana on April 2, 2008 and began a substance abuse program, which he attended three days a week.  (*Id.*).  Wearen reported that he lived with his grandmother, had dropped out of school in the tenth or eleventh grade, and worked a few days each week at his father's restaurant.  (*Id.*).  Treatment notes also indicate that Wearen previously had surgery on his right ankle.  (*Id.*).

---

[4]  The treatment notes suggest that Shah was a medical resident and that Scofield was the supervising attending physician.  (Tr. 448).  It appears that Wearen generally met with Shah, who then discussed his impressions and assessments with the supervising attending physician.  (*See generally* Tr. 444-503).

Examination notes indicate that Wearen's left knee was positive for effusion, mild crepitus with flexion and extension with full range of motion and no joint instability. (Tr. 447). Shah assessed chronic left knee pain stemming from an ACL tear in 2005, but noted that it was currently asymptomatic. (*Id.*). This left knee assessment is inconsistent with Wearen's report that he had injured his *right* knee in 2005, although it is consistent with the "active problems" list in the treatment notes indicating that the 2005 ACL tear was in his left knee. (Tr. 446-47). Shah also assessed morbid obesity, diabetes mellitus type 2, hypertension, left ventricular hypertrophy and marijuana abuse. (Tr. 446).

Shah opined that Wearen was "extremely high risk," was not properly taking care of himself, and was "in grave danger of a myriad of complications in the near term." (*Id.*). Shah prescribed Metformin and Lisinopril and ordered blood work. (*Id.*). Shah also referred Wearen to an ophthalmologist and a podiatrist. (*Id.*).

Wearen returned for a follow-up visit with Shah on December 10, 2008. (Tr. 451-53). Wearen reported that he had gone to the gym every day during the summer, but had since reduced his frequency to two or three times a week in order to attend GED classes. (*Id.*). Wearen reported that he hoped to become a surgical technician or obtain his culinary arts certification. (*Id.*). Wearen reported that he used weights, swam, rode a bike and occasionally played basketball. (*Id.*). Wearen had lost approximately nine pounds since his last appointment in April and continued to attend a substance abuse treatment program. (*Id.*).

Shah opined that Wearen's December 2008 blood levels were much improved and recommended that Wearen continue taking Lantus, renewed his prescription for Lisinpril to manage his hypertension and referred him to a diabetic nutritionist. (*Id.*). (The treatment notes indicated that in June 2008 Wearen had been hospitalized due to hyperglycemia.) (*Id.*). On

physical examination, Shah noted left knee effusion with mild crepitus with flexion/extension, but full range of motion and no joint instability.  (*Id.*).  Again, the treatment notes indicated a history of right knee pain stemming from a basketball injury, but the active problems list indicated that the injury was to the left knee.  (*Id.*).

Wearen saw Shah again on February 12, 2009.  (Tr. 459-61).  Wearen reported that he continued to go to the gym two to three times a week, attended a substance abuse program and had taken the first day of the GED examination.  (*Id.*).  Wearen also reported that he was walking his dog approximately twenty to thirty minutes each day.  (*Id.*).  Wearen expressed interest in a referral for bariatric surgery.  (*Id.*).  Shah increased Wearen's Lantus dosage, noted that Wearen's blood pressure was at goal, referred Wearen to the bariatric surgery program and recommended that Wearen continue nutritional counseling for his diabetes.  (*Id.*).

On September 8, 2009, Wearen attended another appointment with Shah and Scofield.  (Tr. 462-64).  During the appointment, Wearen reported that he goes to the gym approximately three times a month and that he walks to the bus daily.  (*Id.*).  Wearen reported that he had completed his GED and was hoping to start a course in order to become a surgical technician.  (*Id.*).  Wearen again expressed interest in a referral for bariatric surgery.  (*Id.*).  Treatment notes indicated that Wearen suffered from chronic left knee pain, which intermittently limited his ability to walk.  (*Id.*).  Upon examination, his left knee continued to display minimal effusion and mild crepitus with flexion/extension and full range of motion and no evidence of joint instability.  (*Id.*).  Shah and Scofield recommended that Wearen continue treatment with his endocrinologist, Dr. Rajamani, and monitor his blood glucose levels at least twice daily.  (*Id.*).  They also recommended that Wearen exercise at the gym more often and that he continue walking daily.  (*Id.*).

Treatment records indicate that on December 9, 2009, Wearen attended an appointment with Benjamin Crane ("Crane"), MD, an otolaryngologist, to assess complaints of hearing loss in his right ear and tinnitus.  (Tr. 469-71).  After evaluation and examination, Crane recommended an MRI to rule out a cerebral pontine angle mass.  (*Id.*).  Crane advised that the tinnitus experienced by Wearen was both common and benign, and could be improved by eliminating dietary triggers.  (*Id.*).  On December 21, 2009, Wearen underwent an MRI of his head.  (*Id.*).  The radiologist opined that the results indicated a normal MRI of the brain with no evidence of CP angle mass lesion, but noted that the MRI demonstrated enlarged andenoids and left maxillary sinusitis.  (*Id.*).

On April 22, 2010, Wearen attended another appointment with Shah. (Tr. 476-78).  Wearen reported that he was regularly taking his medication, but rarely monitored his blood glucose levels.  (*Id.*).  Wearen was unable to explain his forty-six pound weight gain over the prior six months.  (*Id.*).  Shah advised Wearen to exercise more frequently, eat meals at regular intervals and monitor his blood glucose levels.  (*Id.*).

On June 12, 2010, Wearen went to the Strong Memorial Hospital's Emergency Department complaining of low back pain.  (Tr. 479-81).  Wearen reported that he had injured his back the previous day bending over to pick up laundry.  (*Id.*).  Upon examination, tenderness was noted in the lumbosacral area upon palpation, although it did not radiate and Wearen was able to perform the straight leg raise to 90 degrees.  (*Id.*).  An x-ray of the lower lumbosacral spine revealed no acute disease.  (*Id.*).  Wearen was prescribed Percocet and Flexeril, which relieved his pain.  (*Id.*).

On June 17, 2010, Wearen attended an appointment with Scofield complaining of continued back pain.  (Tr. 482-85).  According to Wearen, he had been experiencing back pain

for the past week that was aggravated by prolonged sitting or standing.  (*Id.*).  Upon examination, Scofield noted mild to moderate tenderness to palpation across the lumbar spine and paraspinal area and a negative straight leg test.  (*Id.*).  According to Scofield, images of Wearen's lumbar spine demonstrated no evidence of fracture, dislocation or acute bony abnormality.  (*Id.*).  Scofield noted that although Wearen complained of some radicular symptoms, his examination did not suggest any neurological findings.  (*Id.*).  Scofield prescribed Naproxen, heat, and low back exercises.  (*Id.*).

Wearen returned on June 22, 2010 for a health maintenance visit.  (Tr. 491-95). Wearen reported that his lower back pain was improving with heat exercises and Naproxen. (*Id.*).  Although he continued to experience positional discomfort, his back was much better. (*Id.*).  Wearen had lost fifty-one pounds since April 2010.  (*Id.*).  According to Wearen, he was following a better diet, stopped drinking soda and was walking his dog approximately one hour every day.  (*Id.*).  Wearen reported that his left knee continued to affect him intermittently.  (*Id.*). Wearen reported that he continued to abstain from marijuana and was scheduled to complete his substance abuse treatment program in September.  (*Id.*).  Upon examination, Wearen's left knee demonstrated large, chronic effusion with full range of motion, no crepitus and was positive for Lachman's but negative for McMurray's.  (*Id.*).  Scofield referred Wearen to an orthopedist to evaluate his knee for possible treatment.  (*Id.*).

On July 22, 2010, Wearen attended an appointment with C. McCollister Evarts ("Evarts"), MD, at Strong Memorial Hospital for an assessment of his ongoing left knee pain. (Tr. 498-501).  The treatment notes indicate that Wearen had treated at the same clinic in 2005 for his left knee, at which time Wearen had been diagnosed with a large ostcochondral defect on the lateral aspect of his femoral condyle, several loose bodies in the suprapatellar joint space, a

complete ACL tear with an avulsion injury to the lateral aspect of the medial tibial plateau and a

displaced medial meniscus tear suggestive of a grade I sprain of the MCL.  (*Id.*).  Wearen had

been prescribed physical therapy and encouraged to treat with anti-inflammatory medications

and activity modification.  (*Id.*).  In addition, Wearen had been told to follow-up in three weeks

to discuss surgical options, but he never returned.  (*Id.*).

During the July 2010 appointment, Wearen complained of left knee pain,

intermittent swelling and mechanical symptoms, including locking, clicking and catching.  (*Id.*).

According to Wearen, he experiences knee-related difficulties when climbing stairs and during

prolonged walking.  (*Id.*).  Wearen also reported that he can occasionally feel the loose body in

his suprapatellar pouch and that he experiences pain with locking when the knee is extended and

flexed.  (*Id.*).  Upon examination, Evarts noted mild effusion and a palpable loose body in the

suprapatellar pouch, full range of motion, negative posterior drawer test, abnormal Lachman

examination with no endpoint and intact sensation to light touch in the entire extremity.  (*Id.*).

According to Evarts, images of Wearen's left knee demonstrated marked

tricompartmental degenerative changes with joint space narrowing, subchondral sclerosis and

multiple loose bodies.  (*Id.*).  Evarts assessed chronic ACL sprain, multiple loose bodies, a large

femoral condyle OCD lesion and sequelae of chronic instability resulting in osteoarthrosis.  (*Id.*).

According to Evarts, treatment options were limited and included conservative measures,

including activity modification, rest, nonsteroidal anti-inflammatory medicines, ice and

elevation.  (*Id.*).  Evarts recommended continued weight loss as imperative to decrease the stress

on the knee joint and to avoid running or jumping exercises.  (*Id.*).  Evarts prescribed physical

therapy to maintain his range of motion and to strengthen his muscles.  (*Id.*).  Evarts opined that

surgical options were limited because the degree of degeneration precluded the possibility of

ACL reconstruction.  (*Id.*).  According to Evarts, although arthroscopic surgery with debridement and removal of loose bodies was possible, Wearen was not a good surgical candidate due to his ongoing medical issues.  (*Id.*).  Evarts indicated that any surgical referral would require clearance by Scofield.  (*Id.*).  Evarts recommended that Wearen consider bariatric surgery, continue to treat the left knee conservatively, continue his weight loss and return in approximately four months to assess whether he was a candidate for surgery.  (*Id.*).

On April 26, 2011, Wearen attended an appointment with medical resident Hilary Southerland ("Southerland") and attending physician Karen Nead ("Nead").  (Tr. 501-03). During the appointment, Wearen reported that he was attending classes part-time at Monroe Community College ("MCC") for addiction counseling.  (*Id.*).  He requested that the doctors complete paperwork for disability claiming that he was unable to work due to his diabetes, left knee pain and right ankle pain.  (*Id.*).  According to Wearen, the Department of Social Services required him to work nineteen hours per week in order to continue receiving assistance.  (*Id.*).

The treatment notes indicate that Wearen was noncompliant with his prescribed treatment for diabetes and hypertension.  (*Id.*).  Upon examination, the doctors noted a scar on Wearen's right ankle.  (*Id.*).  They opined that Wearen could work part-time with restrictions due to his chronic ACL tear and chronic ankle pain.  (*Id.*).

## 2.   **Unity Hospital Records**

Treatment records indicate that Wearen was admitted to Unity Hospital on June 15, 2008 for complaints of nausea and weakness.  (Tr. 244-60).  Wearen indicated that he had not been compliant with his prescribed treatment for diabetes and hypertension.  (*Id.*).  Upon admission, Wearen's blood glucose level was approximately 1300.  (*Id.*).  Wearen was administered insulin, and his blood glucose level dropped to 297.  (*Id.*).  Wearen was discharged

and advised to follow-up with his primary care physician and to schedule an appointment with his endocrinologist Dr. Rajamani.  (*Id.*).

### 3.    Krishnakumar Rajamani, MD

Wearen attended an appointment with Krishnakumar Rajamani ("Rajamani"), MD, on January 16, 2009.  (Tr. 262-69, 441-43).  Treatment notes indicate that Wearen was referred for consultation regarding his diabetes.  (*Id.*).  Rajamani noted that Wearen had been hospitalized in June 2008 with blood glucose levels in the 1400s.  (*Id.*).  Rajamani recommended that Wearen continue taking Prinvil, Lantus and Humalog.  (*Id.*).  He also recommended that Wearen keep detailed track of his blood glucose levels, referred him to a nutritionist and recommended a follow-up appointment in two weeks.  (*Id.*).

### 4.    University of Rochester Physical Therapy

Treatment records indicate that Wearen received physical therapy through the University of Rochester Physical Therapy Department in 2005.  (Tr. 433-39, 504-12).  Wearen reported that he experienced intermittent sharp pain that was aggravated by walking and standing.  (*Id.*).  Wearen also reported that his knee buckled approximately three times a week.  (*Id.*).  The physical therapist recommended weekly therapy for four weeks.  (*Id.*).  Treatment notes indicate that Wearen failed to return after the first visit and was discharged from treatment for noncompliance.  (*Id.*).

### B.    Medical Opinion Evidence[5]

On April 28, 2009, state examiner Karl Eurenius ("Eurenius"), MD, conducted a consultative internal medicine examination.  (Tr. 341-44).  Wearen reported that he suffered

---

[5]  The record contains medical opinions regarding Wearen's mental functional capacity from state examining and non-examining physicians.  Wearen does not challenge the ALJ's mental RFC determination, and those opinions are not summarized herein.

from back and knee problems.  (*Id.*).  According to Wearen, he experiences a stabbing pain in his left knee and feels that it locks up, requiring him to massage it in order to loosen it, and that he senses loose pieces in his knee.  (*Id.*).  He reported that he attended physical therapy without relief.  (*Id.*).  Wearen stated that he had experienced back pain for approximately two months.  (*Id.*).  Wearen described the pain as sharp and radiating to his right hip.  (*Id.*).  Eurenius noted that Wearen previously had surgery on his right ankle in 2002.  (*Id.*).

Wearen reported that he was able to cook and clean, but had difficulty shopping because of the walking required.  (*Id.*).  Wearen stated that he was able to care for his own personal hygiene and enjoyed watching television, listening to the radio, reading and drawing.  (*Id.*).

Upon examination, Eurenius noted that Wearen had a normal gait, used no assistive devices and did not need any assistance changing for the exam, rising from the chair or getting on or off of the exam table.  (*Id.*).  According to Eurenius, Wearen did not appear to be in acute distress, could stand on his heels and toes and could squat only one-quarter of the way due to left knee pain.  (*Id.*).

Eurenius noted that Wearen's cervical spine showed full flexion, extension, lateral flexion bilaterally and full rotary movement bilaterally.  (*Id.*).  Eurenius identified no scoliosis, kyphosis or abnormality in Wearen's thoracic spine.  (*Id.*).  Eurenius found that Wearen's lumbar flexion was limited to 45 degrees with pain in the low-mid back and right hip, and that his lateral flexion and extension were full bilaterally.  (*Id*).  Rotation was reduced on the left side to 20 degrees with pain in the right hip.  (*Id.*).  The straight leg raise was positive on the left side at 90 degrees and 60 degrees on the right side with pain in the low-mid back and hip.  (*Id.*).  Eurenius found full range of motion in the shoulders, elbows, forearms and wrists.  (*Id.*).  He also found

full passive range of motion in the hips, knees and ankles bilaterally, with the exception of hip

flexion due to obesity.  (*Id.*).  Eurenius assessed strength in the upper and lower extremities to be

five out of five.  (*Id.*).  Eurenius found Wearen's hand and finger dexterity to be intact and his

grip strength to be five out of five bilaterally.  (*Id.*).

Eurenius diagnosed Wearen with diabetes mellitus, insulin dependent,

hypertension, chronic back pain, uncertain etiology, and chronic left knee pain, uncertain

etiology.  (*Id.*).  Eurenius opined that Wearen was limited in walking more than two city blocks,

climbing more than two flights of stairs, bending and lifting more than twenty pounds and

carrying more than forty pounds, and kneeling due to a combination of left knee and back pain.


III.    **Non-Medical Evidence**

In his application for benefits, Wearen indicated that he had obtained his GED in

2007.  (Tr. 204).  Wearen reported that he had been previously employed as a dietary aide in a

nursing home for approximately three months in 2005.  (*Id.*).  Wearen reported that he worked

four hours a day, approximately three days per week.  (*Id.*)

Wearen indicated that he lived alone.  (Tr. 213).  According to Wearen, his daily

activities included showering, dressing, going to group, watching television and going to the

library.  (*Id.*).  Wearen reported that he previously was able to play sports, walk around his

neighborhood, run and ride his bike, but can no longer engage in those activities.  (Tr. 214).

According to Wearen, he is able to care for his personal hygiene and prepare his own meals.

(*Id.*).  In addition, Wearen is able to perform household chores, including cleaning his room,

doing the laundry and ironing, but is unable to complete outdoor chores due to pain in his legs

and back.  (Tr. 215).  According to Wearen, his household chores take him longer to complete

and he is unable to use a ladder or lift heavy objects.  (Tr. 163).  Wearen reported that he is also able to grocery shop monthly.  (Tr. 215).  Wearen leaves his house daily, using public transportation or riding in a car.  (*Id.*).  Wearen does not have a driver's license.  (*Id.*).  Wearen is able to prepare his daily meals.  (Tr. 162).

According to Wearen, he has difficulty lifting due to back pain, and sitting, standing and walking for prolonged periods causes pain.  (Tr. 216-17).  Wearen reported that he is able to walk approximately fifteen minutes before needing to rest and that walking long distances may cause pain for several days thereafter.  (*Id.*).  Additionally, Wearen can climb only short sets of stairs and cannot kneel or squat.  (*Id.*).  Wearen reported that he wears glasses and is deaf in his right ear.  (*Id.*).

Wearen claimed to have experienced pain in his back, knees and ankle since he was a teenager and indicates that the pain radiates from his back to his left leg.  (Tr. 218).  Wearen experiences daily pain, which is aggravated by sitting, walking and standing.  (Tr. 219).  Wearen takes ibuprofen or Motrin to alleviate the pain, which is generally effective within two hours.  (*Id.*).  Wearen previously used Percocet for pain relief, but stopped because it made him "jittery."  (*Id.*).  Wearen also uses heating pads to treat the pain.  (*Id.*).  According to Wearen, his daily activities include walking to the bus stop, making his bed and vacuuming his room.  (*Id.*).

During the administrative hearing, Wearen testified that he was born in 1987.  (Tr. 37-38).  Wearen testified that he has never had full-time employment.  (*Id.*).  At the time of the hearing, Wearen was attending classes for addiction counseling at MCC.  (Tr. 38-40).  According to Wearen, he had some attendance problems at MCC stemming from the pain in his knees and back.  (Tr. 40-41).

Wearen testified that his most serious impairment was his left knee. (Tr. 42). According to Wearen, he injured his left knee playing basketball at a family event in 2005. (*Id.*). Wearen's knee now gets "stuck" and swells, and he sometimes feels something moving in his knee. (Tr. 42-43). According to Wearen, he wears a non-prescribed brace on his knee. (*Id.*). Wearen testified that he previously had surgery on his right ankle and that although he has had "little problems" with his right knee, they were not as significant as his left knee problems. (Tr. 45-46). Additionally, Wearen testified that he sometimes experiences numbness in his right foot. (Tr. 53).

Wearen testified that he feels a sharp, stabbing pain in his right ankle when he stands or walks. (Tr. 46). In addition, Wearen testified that he even feels pain in his left knee when he is seated and can walk only approximately two to three minutes before needing to sit. (Tr. 48). According to Wearen, he can climb approximately three to four stairs before his knee locks up. (*Id.*). Wearen testified that standing and walking cause his knee to swell, particularly because he tends to place more pressure on his left leg due to his right ankle injury. (Tr. 49). Wearen estimated that he could stand for five or ten minutes before needing to sit and that he could sit for approximately twenty minutes before needing to stand. (Tr. 49-50). Wearen testified that he is not limited in the amount of weight he can lift, although his back hurts lifting, especially if he bends over. (Tr. 50-51). Wearen testified that he attempts to alleviate his pain by using over-the-counter medications and elevating his leg. (Tr. 62-63). Wearen also testified that he is deaf in his right ear. (Tr. 63).

Wearen testified that he assists his mother by prepping meals, but is unable to stand to cook, and by washing small quantities of dishes and sweeping the floor. (Tr. 56-58). According to Wearen, he watches his five-year-old nephew and listens to music. (Tr. 56-57).

Wearen reported that he is unable to grocery shop because he cannot walk through the store and his mother helps him with his laundry.  (Tr. 58).  Wearen testified that his inability to complete household chores without help prompted him to move in with his mother.  (Tr. 60-61).

Vocational expert, Peter Manzi ("Manzi"), also testified during the hearing. (Tr. 66-73, 159).  The ALJ first asked Manzi whether jobs existed in the national economy for a person of the same age as Wearen, with the same education and vocational profile, who had the capacity to perform the full range of light work, except that the individual could not kneel, climb ladders or scaffolds, needed to be permitted to change positions briefly every forty-five minutes and could walk no more than ten minutes at one time.  (Tr. 67).  Manzi testified that such an individual would be able to perform positions that existed in the national economy, including positions as a laundry sorter and collator operator.  (*Id.*).

Next, the ALJ asked Manzi whether jobs would exist for the same individual with the same limitations, except that the individual could be exposed to no more than moderate noise level.  (Tr. 68).  Manzi testified that such an individual could perform the previously identified positions.  (*Id.*).  The ALJ then asked Manzi whether jobs would exist for the same individual, except that instead of being able to perform the full range of light work, the individual could only perform the full range of sedentary work, with the previously identified limitations.  (*Id.*).  Manzi testified that such an individual would be able to perform jobs in the national economy, including positions as a telephone quotation clerk and charge account clerk.  (*Id.*).  Finally the ALJ asked Manzi whether jobs existed for an individual with same limitations, except that the individual would be off-task approximately twenty percent of the time.  (*Id.*).  Manzi testified that such an individual could not perform unskilled work in the economy.  (Tr. 69).

Wearen's attorney asked Manzi to assume the same assumptions as those set forth in the ALJ's first hypothetical and to assume that the individual would have to leave his work station for ten minutes every hour in order to walk.  (Tr. 70-71).  Manzi testified that such an individual could not maintain employment under those conditions.  (*Id.*).  Additionally, Manzi testified that there would be no positions available for such an individual if he needed to elevate his leg for one-third of the workday.  (Tr. 71-73).

## DISCUSSION

I.   Standard of Review

This Court's scope of review is limited to whether the Commissioner's determination is supported by substantial evidence in the record and whether the Commissioner applied the correct legal standards.  *See Butts v. Barnhart*, 388 F.3d 377, 384 (2d Cir. 2004) ("[i]n reviewing a final decision of the Commissioner, a district court must determine whether the correct legal standards were applied and whether substantial evidence supports the decision"), *reh'g granted in part and denied in part*, 416 F.3d 101 (2d Cir. 2005); *see also Schaal v. Apfel*, 134 F.3d 496, 501 (2d Cir. 1998) ("it is not our function to determine *de novo* whether plaintiff is disabled[;] . . . [r]ather, we must determine whether the Commissioner's conclusions are supported by substantial evidence in the record as a whole or are based on an erroneous legal standard") (internal citation and quotation omitted).  Pursuant to 42 U.S.C. § 405(g), a district court reviewing the Commissioner's determination to deny disability benefits is directed to accept the Commissioner's findings of fact unless they are not supported by "substantial evidence."  *See* 42 U.S.C. § 405(g) ("[t]he findings of the Commissioner . . . as to any fact, if supported by substantial evidence, shall be conclusive").  Substantial evidence is

defined as "more than a mere scintilla.  It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (internal quotation omitted).

To determine whether substantial evidence exists in the record, the court must consider the record as a whole, examining the evidence submitted by both sides, "because an analysis of the substantiality of the evidence must also include that which detracts from its weight." *Williams ex rel. Williams v. Bowen*, 859 F.2d 255, 258 (2d Cir. 1988).  To the extent they are supported by substantial evidence, the Commissioner's findings of fact must be sustained "even where substantial evidence may support the claimant's position and despite the fact that the [c]ourt, had it heard the evidence *de novo*, might have found otherwise." *Matejka v. Barnhart*, 386 F. Supp. 2d 198, 204 (W.D.N.Y. 2005) (citing *Rutherford v. Schweiker*, 685 F.2d 60, 62 (2d Cir. 1982), *cert. denied*, 459 U.S. 1212 (1983)).

A person is disabled for the purposes of SSI and disability benefits if he or she is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. §§ 423(d)(1)(A) & 1382c(a)(3)(A).  When assessing whether a claimant is disabled, the ALJ must employ a five-step sequential analysis.  *See Berry v. Schweiker*, 675 F.2d 464, 467 (2d Cir. 1982) (*per curiam*).  The five steps are:

    (1)    whether the claimant is currently engaged in substantial gainful activity;

    (2)    if not, whether the claimant has any "severe impairment" that "significantly limits [the claimant's] physical or mental ability to do basic work activities";

(3)     if so, whether any of the claimant's severe impairments
         meets or equals one of the impairments listed in Appendix
         1 of Subpart P of Part 404 of the relevant regulations;

(4)     if not, whether despite the claimant's severe impairments,
         the claimant retains the residual functional capacity to
         perform his past work; and

(5)     if not, whether the claimant retains the residual functional
         capacity to perform any other work that exists in significant
         numbers in the national economy.

20 C.F.R. §§ 404.1520(a)(4)(i)-(v) & 416.920(a)(4)(i)-(v); *Berry v. Schweiker*, 675 F.2d at 467.

"The claimant bears the burden of proving his or her case at steps one through four[;] . . . [a]t

step five the burden shifts to the Commissioner to 'show there is other gainful work in the

national economy [which] the claimant could perform.'"  *Butts v. Barnhart*, 388 F.3d at 383

(quoting *Balsamo v. Chater*, 142 F.3d 75, 80 (2d Cir. 1998)).

## A.     The ALJ's Decision

            In his decision, the ALJ followed the required five-step analysis for evaluating

disability claims.  (Tr. 19-26).  Under step one of the process, the ALJ found that Wearen has not

engaged in substantial gainful activity since July 14, 2010, the application date.  (Tr. 21).  At step

two, the ALJ concluded that Wearen has the severe impairments of right knee ligamentous

damage, obesity and hearing loss, right ear.  (*Id.*).  The ALJ concluded that Wearen's other

impairments, including hypertension, diabetes mellitus and right ankle injury were non-severe.

(*Id.*).  At step three, the ALJ determined that Wearen does not have an impairment (or

combination of impairments) that meets or medically equals one of the listed impairments.

(Tr. 21-22).  The ALJ concluded that Wearen has the Residual Function Capacity ("RFC") to

perform light work, except that he is unable to kneel, climb ladders or scaffolds, needs to

alternate sitting and standing every forty-five minutes, can walk no more than ten feet at a time,

and can work in an environment with no more than a moderate noise level.  (Tr. 22).  At step

four, the ALJ determined that Wearen had no past relevant work.  (Tr. 24).  Finally, at step five,

the ALJ concluded that Wearen could perform jobs that existed in the local and national

economy, including laundry sorter and collator operator.  (Tr. 25).  Accordingly, the ALJ found

that Wearen is not disabled.  (Tr. 25-26).

### B.    **Wearen's Contentions**

Wearen challenges the ALJ's determination on three grounds.  First, Wearen

maintains that the ALJ erred at step two because he did not determine whether Wearen's left

knee impairments were severe or nonsevere.  (Docket # 11-1 at 5-9).  According to Wearen, the

ALJ concluded that Wearen's right knee ligamentous damage was severe, but was silent as to his

left knee impairment.  (*Id.*).  Alternatively, Wearen argues that if the ALJ's severity assessment

contains a typographical error and was intended to relate to Wearen's *left* knee, the ALJ

nevertheless erred because he did not make a severity finding as to Wearen's *right* knee

impairment.  (*Id.*).  The government maintains that the ALJ's severity finding clearly relates to

Wearen's *left* knee, that the reference to Wearen's right knee was a typographical error, and that

the absence of any discussion of Wearen's right knee in the ALJ's opinion was appropriate

because it caused no functional limitations.  (Docket # 19 at 1-4).

Second, Wearen challenges the ALJ's RFC determination on the grounds that it is

internally inconsistent.  (Docket # 11-1 at 9-12).  According to Wearen, the ALJ determined that

Wearen was able to perform light work, but also determined that Wearen was unable to walk

more than ten feet at a time.  (*Id.*).  Wearen maintains that the walking limitation is inconsistent

with a determination that he can perform light work.  (*Id.*).  According to Wearen, although the

ALJ engaged a vocational expert, the hypothetical posed to the vocational expert included a

ten-minute (as opposed to ten-foot) walking limitation.  (*Id.*).  The government contends that the

reference to "ten feet" was a second typographical error because the ALJ evidently intended to

limit Wearen to walking no more than "ten minutes" at a time, consistent with the hypothetical

posed to the vocational expert.  (Docket # 19 at 4-5).

      Finally, Wearen maintains that the ALJ erred by failing to consider or to assign

weight to an "opinion" provided by Nead.  (Docket # 11-1 at 12-14).  Additionally, Wearen

contends that the ALJ erred by failing to indicate the weight, if any, he assigned to the opinion of

Eurenius.  (*Id.*).


**II.**    **Analysis**

    **A.**    **Typographical Errors**

      The dispute between the parties primarily involves a determination whether the

ALJ's decision contained two typographical errors, and if so, whether those errors require

remand.  Having carefully reviewed the record and the ALJ's decision, I find that the ALJ's

decision contained typographical errors in his severity assessment and his RFC determination,

but conclude that neither, taken alone or together, requires remand.

      With respect to the ALJ's severity assessment, the record and the ALJ's decision

make clear that the ALJ's conclusion that Wearen's knee ligamentous damage was severe related

to his left knee.  Wearen's treatment records are replete with references to his left knee injury.

Treatment records from Culver Medical Group demonstrate that Wearen's left knee was

determined by his physicians to have some level of impairment on numerous occasions (*see*, *e.g.*,

Tr. 447, 451-53, 462-64, 491-95, 501-03), by a consultative medical examiner during an

examination in 2009 (*see*, *e.g.*, Tr. 341-44), and by an orthopedist in 2010 (*see*, *e.g.*,

Tr. 498-501). The record also contains images of Wearen's left knee dated July 22, 2010, which demonstrate "severe degenerative changes," including joint space narrowing, osteophytosis and loose intra-articular bodies. (Tr. 496). Moreover, Wearen himself testified that his 2005 left knee injury was his most serious impairment affecting his ability to work. (Tr. 42). In the disability report submitted in connection with his claim, Wearen repeatedly referred to his left knee injury. (Tr. 203, 207, 237). Further and unsurprisingly, the ALJ's decision contains a lengthy discussion concerning Wearen's left knee impairment in connection with the RFC formulation.

By contrast, the record is virtually devoid of any suggestion that Wearen had any impairments in his right knee. Wearen did not mention his right knee in the impairments listed in his disability report. (Tr. 203). During his testimony, Wearen characterized the issues relating to his right knee as not as significant as those relating to his left knee. (Tr. 46). The medical records contain minimal references to Wearen's right knee. Treatment records from Culver Medical Group mentioned Wearen's right knee injury only twice, although a complete review of those treatment notes reveals that they actually pertained to his left knee. (Tr. 445, 451-53). Finally, the record contains opinions from two radiologists addressing only minimal degenerative changes in the right knee. (Tr. 345, 496).

A review of the record dispels any speculation that the ALJ's finding of severe knee impairment was intended to apply to Wearen's right knee. The record plainly supports a finding that Wearen suffers from a severe impairment in his left knee, as demonstrated by objective medical findings. It does not support a finding of any severe impairment in Wearen's right knee, much less that he suffers from physical limitations as a result of a right knee impairment. Accordingly, I conclude that the ALJ's reference to the right knee in the severity

finding was the result of a scrivener's error and does not require remand.  *See Norst v. Comm'r of Soc. Sec.*, 2014 WL 4966714, *4 (N.D.N.Y. 2014) ("the Court will assume that the ALJ's description of [p]laintiff's severe hearing loss as being in his left ear was a scrivener's error, that the ALJ intended to refer to the hearing loss in [p]laintiff's right ear which required him to use a hearing aid, and that the error is harmless since the ALJ's decision would be the same despite the error"); *Jones v. Astrue*, 2011 WL 2669101, *2 n.2 (W.D. Va. 2011) ("[t]he court notes that the ALJ mistakenly references an avulsion of the right little finger in his finding; however, this error is immaterial as the rest of the decision correctly states that plaintiff suffered an avulsion of the little finger on her left hand"); *Swinson v. Astrue*, 2009 WL 2985667, *3 n.5 (M.D. Fla. 2009) ("[i]t appears the ALJ inadvertently stated that [p]laintiff could perform push/pull functions with his 'right upper extremity'; however, the context makes it clear that the ALJ meant to say 'left upper extremity'").  In any event, I conclude that any error resulting from the ALJ's failure to determine that Wearen's left knee impairment was not severe at step two was harmless because the ALJ proceeded through the remainder of the sequential analysis and considered Wearen's left knee impairment when formulating the RFC.  *See Reices-Colon v. Astrue*, 523 F. App'x 796, 798 (2d Cir. 2013) (an error at step two may be harmless if the ALJ identifies other severe impairments at step two, proceeds through the remainder of the sequential evaluation process and specifically considers the "nonsevere" impairment during subsequent steps of the process); *Diakogiannis v. Astrue*, 975 F. Supp. 2d 299, 311-12 (W.D.N.Y. 2013) ("[a]s a general matter, an error is an ALJ's severity assessment with regard to a given impairment is harmless . . . when it is clear that the ALJ considered the claimant's [impairment] and their effect on his or her ability to work during the balance of the sequential evaluation process") (internal quotations omitted).

I further conclude that the ALJ did not err by failing to discuss Wearen's alleged right knee impairment because the record simply does not suggest that a medically determinable impairment exists. *See Piatt v. Colvin*, 2015 WL 274180, *9-10 (W.D.N.Y. 2015) (ALJ did not err by failing to consider plaintiff's carpal tunnel syndrome or restless leg syndrome at step two where those impairments were not listed in the application for benefits and where there was no evidence that plaintiff received treatment for those impairments; even if the ALJ erred, such error was harmless "in light of the fact that the record does not show these alleged ailments as medically determinable impairments").

I reach a similar conclusion with respect to the ALJ's RFC determination. Wearen contends that the ALJ determined that he was unable to walk more than ten feet at a time. The government counters that the ALJ's finding was that Wearen could not walk more than ten *minutes* at a time and that the reference to "*feet*" was a typographical error. The record, particularly the questions posed to and answers given by the vocational expert during the administrative hearing, demonstrate that the government's position is correct.

During the hearing, the ALJ asked the vocational expert whether there were unskilled occupations that could be performed by an individual with the RFC to perform the full range of light work, except that the "individual should be involved in no kneeling, no climbing of ladders or scaffolding, should be given opportunity to change position briefly every 45 minutes[,] [and should] [w]alk no more than *ten minutes* at one stretch." (Tr. 67) (emphasis supplied). The vocational expert opined that such an individual could perform the positions of laundry sorter and collator operator. (*Id.*).

In his decision, the ALJ concluded that Wearen retained an RFC consistent with the limitations contained in the hypothetical that he had posed to the vocational expert, with the

exception that he stated Wearen could not walk more than ten feet as opposed to ten minutes.  In

his step five determination, the ALJ specifically stated that he "asked the vocational expert

whether jobs exist in the national economy for an individual with the claimant's age, education,

work experience, ***and residual functional capacity***."  (Tr. 25).  According to the ALJ's decision,

the vocational expert testified that such an individual could perform the occupations of laundry

sorter and collator operator.  (*Id.*).  Based upon that testimony, the ALJ concluded that Wearen

was not disabled.  (*Id.*).

        In sum, the record and the language of the ALJ's decision demonstrates that his

RFC determination includes the same limitations as he posed to vocational expert during the

hearing.  These circumstances establish that the reference was merely a harmless typographical

error and does not necessitate remand.  *See Lopez v. Astrue*, 371 F. App'x 887, 888 n.1 (10th Cir.

2010) ("[w]e note that although the ALJ specifically stated that [plaintiff] retained the RFC to

perform sedentary work, . . . this limitation is likely a typographical error, as the Commissioner

suggests, because the lifting, standing and walking limitations the ALJ articulated are consistent

with light work, not sedentary work, and because the ALJ propounded a hypothetical to the

vocational expert that defined [plaintiff's] RFC as light work") (internal citations and quotations

omitted); *Farmer v. Comm'r of Soc. Sec.*, 2014 WL 4237364, *12-13 (D.N.J. 2014) (concluding

that ALJ's statement that plaintiff could not stand for prolonged periods was a typographical

error where the hypothetical posed to the vocational expert only included limitations for

prolonged sitting; "[c]ourts in this Circuit have been willing to categorize inconsistency in an

ALJ's decision as a typographical error when the ALJ's intent is otherwise apparent from the

decision as a whole"); *Parrish v. Colvin*, 2014 WL 4053397, *9 (M.D. Tenn. 2014) (ALJ's

statement that plaintiff was capable of occasionally balancing was a typographical error where

the hypothetical posed to the vocational expert included a never-balance limitations; "[a] plain

reading of the ALJ's decision reveals that the RFC assessment also was based on the [vocational

expert's] testimony[;] . . .[i]t is obvious . . . that the error here is [a] typographical one, and that

the ALJ's RFC determination actually was based on a never-balance limitation"); *Landry v.*

*Comm'r of Soc. Sec.*, 2014 WL 3908200, *5 (M.D. Fla. 2014) ("[i]n this case, the ALJ posed a

hypothetical to the [vocational expert] that accurately reflected [p]laintiff's exertional

limitations[;]. . . [t]he fact that the ALJ erroneously described [p]laintiff as capable of 'sedentary'

work for limitations that fall in the category of 'light' work was harmless error, and the case will

not be remanded"); *May v. Colvin*, 2014 WL 1386412, *4 n.1 (W.D. Okla. 2014) ("[i]t is

apparent that the ALJ's RFC finding in the decision contains a typographical error and that the

ALJ intended to set forth an RFC finding consistent with the exertional requirements for

sedentary work" where "[t]he ALJ's hypothetical inquiry of the [vocational expert] at the hearing

included the ability" to perform the exertional requirements of sedentary work); *Holloway v.*

*Colvin*, 2014 WL 1315249, *27-28 (D.S.C. 2014) (plaintiff challenges "the alleged

inconsistencies between the ALJ's statements that he could perform medium work and his

citation to the statute defining light work"; "[i]t appears to the [c]ourt, however, that the citation

to the statute is actually a typographical error as the ALJ clearly sets out the limitations

associated with medium work in his RFC"); *Shearman v. Comm'r of Soc. Sec.*, 2014 WL

1217966, *1 (S.D. Ohio 2014) (adopting magistrate judge's finding of "harmless error in the

typographical inconsistency in the written RFC that [p]laintiff should have only occasional

contact with the public, when it is clear the ALJ directed the vocational expert to consider only

jobs in a non-public setting, and the [vocational expert] in fact only identified jobs with no public

contact"); *Wilson v. Colvin*, 2014 WL 357052, *2 (N.D. Okla. 2014) (concluding ALJ clearly

meant to limit plaintiff to light work despite reference to both medium and light work in the RFC

finding; "[t]he finding that [p]laintiff is not disabled is based on the vocational expert's responses

to the hypothetical question which was based on the ability to perform 'light' exertional work[;]

[t]he presence of a typographical or scrivener's error in the ALJ's decision does not require

remand"); *Cheeks v. Colvin*, 2013 WL 4498751, *1 n.1 (W.D. Ark. 2013) ("[t]he [c]ourt finds

the omission of the postural limitations . . . in the RFC determination . . . to be a typographical

error, as the ALJ's opinion and questions to the vocational expert clearly show that the ALJ

found [p]laintiff had postural limitations"); *Kosh v. Colvin*, 2013 WL 3816677, *3 n.2 (W.D. Pa.

2013) (concluding ALJ's statements that plaintiff could perform work requiring kneeling,

crawling or squatting was a typographical error since the ALJ described a hypothetical individual

who was precluded from those activities at the hearing); *Godoua v. Astrue*, 2013 WL 3230820,

*1 n.2 (W.D. Ark. 2013) (concluding ALJ meant to recite the lifting and carrying weights for

light as opposed to medium work in RFC determination; "[t]he [c]ourt finds the weights listed in

the RFC finding to be a typographical error, as the ALJ's opinion and questions to the vocational

expert clearly show that the ALJ found [p]laintiff was able to perform light work"), *rev'd and

remanded on other grounds*, 564 F. App'x 876 (8th Cir. 2014); *Roberson v. Astrue*, 2012 WL

3628678, *4 (N.D. Ala. 2012) (concluding that ALJ's RFC determination that plaintiff could

perform exertional requirements of light work with limitations was typographical error; "the

ALJ's error, if any, is harmless because it is clear from the record that the ALJ intended for

[plaintiff] to perform sedentary work with exceptions"); *Blair v. Astrue*, 2012 WL 625001, *5

(W.D. Va. 2012) (concluding that ALJ's RFC assessment contained a typographical error and

that ALJ intended to limit plaintiff to light work where the hypothetical posed to the vocational

expert was nearly identical to the ALJ's RFC determination with the exception of the

typographical error; "[t]he ALJ plainly intended to limit [plaintiff] to light work, and he adopted the vocational expert's finding that at the light exertional level, [plaintiff] can perform her past relevant work[;] . . . [t]here is neither error nor an 'inherent inconsistency' in this finding"); *Ortiz v. Comm'r of Soc. Sec.*, 2012 WL 603223, *6-7 (M.D. Fla. 2012) ("from the ALJ's opinion it is clear that the ALJ simply made a drafting or typographical error in determining [c]laimant's RFC[;] [t]his error does not contradict the ALJ's ultimate findings and a remand to correct the error would be an empty exercise"); *Cummins v. Astrue*, 2011 WL 5570069, *6 n.15 (M.D. Ala. 2011) (concluding ALJ's RFC assessment contained a typographical error limiting claimant to walking or standing up to two hours per day and sitting for six hours per day where the ALJ's hypothetical to the vocational expert contained limitations of walking and standing up to six hours in one day and sitting up to two hours in one day; "[a]fter reviewing the record in conjunction with the ALJ's findings, the court is of the opinion that this was clearly a typographical error and the ALJ intended for the RFC and the hypothetical to reflect identical limitations").

Although the errors led to needless litigation, they are simply unfortunate typographical errors that need not perpetuate further proceedings. The ALJ's findings are clear from the record. Remand is not warranted.

**B.    <u>Weight Afforded to Medical Opinions</u>**

I turn next to Wearen's contentions that the ALJ erred by failing to properly apply the treating physician rule to the "opinion" of Nead and by failing to indicate what weight he assigned to the opinions of Nead and Eurenius. (Docket # 11-1 at 12-14).

As discussed above, the record contains a single treatment note from Nead, an attending physician at the Culver Medical Group. (Tr. 501-03). On April 26, 2011, Wearen

attended an appointment with Southerland, a medical resident at Culver Medical Group, who

was supervised by Nead.  (*Id.*).  During the appointment, Wearen indicated that the Department

of Social Services was requiring him to work nineteen hours per week in order for him to

continue to receive benefits.  (*Id.*).  Wearen explained that he was attending school part-time and

that he did not believe he could work nineteen hours per week due to his diabetes, and left knee

and right ankle pain.  (*Id.*).  After consulting with Southerland, Nead agreed with Southerland's

assessment that Wearen would be able to work part-time, so long as he was provided restrictions

due to his knee and ankle pain.  (*Id.*).  Wearen contends that the ALJ improperly failed to

analyze or assign weight to the opinion of Nead, whom Wearen characterizes as his treating

physician.  (Docket # 11-1 at 12-14).

      As an initial matter, I disagree with Wearen's characterization of Nead as a

treating doctor because the record reflects that Nead only treated Wearen on one occasion before

rendering her opinion.  *See Hamilton v. Astrue*, 2013 WL 5474210, *11 (W.D.N.Y. 2013) ("it is

not clear that [the doctor] may be considered a treating physician because [plaintiff] testified that

the first time she was examined by [the doctor] was when he completed her disability

paperwork") (collecting cases).  Accordingly, I disagree with Wearen that the ALJ violated the

treating physician rule when he failed to assign controlling weight to Nead's opinion or to

explain his rationale for failing to do so.

      With respect to Wearen's contention that the ALJ failed to indicate what weight

he assigned to the opinions of Nead and Eurenius, I conclude that the error, if any, is harmless.

As an initial matter, I am not convinced that Nead's treatment notes are properly characterized as

a medical "opinion" regarding Wearen's disability.  The treatment notes reveal that Nead was

not asked for an opinion as to Wearen's ability to perform work-related functions or to assess his

physical limitations.  Instead, Nead was asked only whether she believed Wearen could work nineteen hours per week.  Her affirmative response to that question does not constitute an opinion that Wearen could only work part-time.  Additionally, her statement that Wearen needed work-restrictions due to his knee and ankle pain is conclusory, not supported by the physical examination conducted that day which was described as "unremarkable," and does not make any attempt to identify what restrictions would be necessary.

In any event, the ALJ cited Nead's treatment note in his decision and engaged in a detailed discussion of Eurenius's findings, which, as specifically recognized by the ALJ, were generally consistent with the ALJ's RFC assessment.  Thus, "any failure to assign a specific weight or 'significant' weight to the opinion[s] was . . . harmless and does not require remand." *See Buscemi v. Colvin*, 2014 WL 4772567, *13 (W.D.N.Y. 2014) (collecting cases). Accordingly, I conclude that the ALJ's failure to assign a specific weight to the opinions of Nead and Eurenius does not require remand.

## CONCLUSION

This Court finds that the Commissioner's denial of SSI was based on substantial evidence and was not erroneous as a matter of law.  Accordingly, the ALJ's decision is affirmed. For the reasons stated above, the Commissioner's motion for judgment on the pleadings (**Docket**

# 10) is **GRANTED**.  Wearen's motion for judgment on the pleadings **(Docket # 11)** is

**DENIED**, and Wearen's complaint (Docket # 1) is dismissed with prejudice.

**IT IS SO ORDERED.**

_____
*s/Marian W. Payson*
MARIAN W. PAYSON
United States Magistrate Judge

Dated: Rochester, New York
March 10, 2015